**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Civ. Action No. _____** |
| *ex rel*. [UNDER SEAL], | **QUI TAM COMPLAINT** |
| Plaintiff, | **FILED UNDER SEAL** |
| v. | **PURSUANT TO** |
| [UNDER SEAL], | **31 U.S.C. § 3730(b)2** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA, STATE
OF CALIFORNIA, STATE OF DELAWARE,
STATE OF FLORIDA, STATE OF
GEORGIA, STATE OF HAWAII, STATE OF
ILLINOIS, STATE OF INDIANA, STATE OF
IOWA, STATE OF MASSACHUSETS,
STATE OF MINNESOTA, STATE OF
MONTANA, STATE OF NEVADA, STATE
OF NEW JERSEY, STATE OF NEW
MEXICO, STATE OF NEW YORK, STATE
OF NORTH CAROLINA, STATE OF
RHODE ISLAND, STATE OF TENNESSEE,
STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA,
DISTRICT OF COLUMBIA,

*ex rel.* JAY MEYER,

        Plaintiff,

    v.

PRAXAIR INC., PRAXAIR
DISTRIBUTIONS INC., and DOES 1-100,

        Defendants.

Civ. Action No. _____

**QUI TAM COMPLAINT**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)2**

**DEMAND FOR JURY TRIAL**

---

## **COMPLAINT**

On behalf of the United States of America, and on behalf of State of California, State of

Delaware, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana,

State of Iowa, State of Massachusetts, State of Minnesota, State of Montana, State of Nevada,

State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of

1

Rhode Island, State of Tennessee, State of Vermont,  Commonwealth of Virginia, District of

Columbia, (the "States), Relator Jay Meyer files this *qui tam* Complaint against Defendant

Praxair Inc. ("Praxair"), Defendant Praxair Distributions, Inc. ("PDI"), and Does 1-100

(individually, or collectively  "Defendants"), alleging as follows:

<u>**INTRODUCTION**</u>

1.      This is an action to recover treble damages and civil penalties on behalf of the

United States of America and the States (collectively the "Government") in connection with a

scheme to defraud the Government by seeking and obtaining payment of claims for products

Defendants knew were defective as a result of a systemic failure of quality controls that resulted in

the consumption and use of extremely hazardous drugs and medical devices.  Defendants failure to

properly monitor, maintain, and cure its defective products from at least 2007 to the present in

direct violation of express certifications of compliance with federal regulations and its own internal

safety guidelines, resulted in the payment of millions of dollars for unqualified and unsafe medical

products.

2.      "Put a band aid on it."  That was the solution to several critical safety breaches

within and among Praxair facilities and devices that produced, stored, and distributed highly

flammable, hazardous industrial and medical gases for healthcare facilities and military

institutions around the world.  The net result of this corporate, profit-driven philosophy that

permeated every division and subsidiary of Praxair was to create a network of extremely

vulnerable hospitals, military bases, and private communities who use or neighbor Praxair

products and facilities.

3.      Praxair is the largest producer of industrial and medical gases in North America, which include oxygen, hydrogen, and nitrogen, among many others.  Praxair produces, stores, and distributes these gases to public and private institutions across the country.

4.      Praxair typically enters into five-year contracts with regional manufacturers, public and private hospitals, branches of the military, and many others to sell liquid and gaseous product depending on the needs and capacity of the customer.  In some cases, Praxair delivers liquefied gas to its own storage vessels built at the customer site, or Praxair converts the product at its air separation plants, and delivers the gas in cylinders.

5.      For its oxygen business, Praxair produces liquid and gaseous oxygen to numerous federal institutions for a variety of purposes including treating patients, flying military aircraft, and underwater training exercises, among numerous others.  Chief among the safety concerns with respect to oxygen production is cleanliness.

6.      As described by Praxair itself, "System cleanliness is critical in oxygen components and systems because contaminants may cause functional anomalies or ignition. Insufficient cleanliness of components used in oxygen systems can result in the ignition of contaminants or components by a variety of mechanisms such as high velocity particle impact, adiabatic compression, mechanical impact, or friction."  Praxair Standard GS-38, Section 4.1.

7.      Accordingly, federal and industry guidelines, adopted by the Federal Government, impose strict requirements with respect to the cleaning and use of oxygen producing devices. Indeed, Praxair has its own internal guidelines, GS-38, which it is required to follow in the production, storage, distribution, and use of oxygen.   Further, GS-38 imposes these guidelines on all downstream Praxair vendors, who must ensure that the component parts for the oxygen

producing devices, such as valves, regulators, and flow meters, are created, stored, and shipped with the utmost care taken to avoid contamination.

8.     Among the products Praxair sells to hospitals, virtually all divisions of the military, federal and state prisons, state universities, and local fire and police departments, which contain these component parts from downstream vendors are, the Grab n Go Advanced Respiratory Systems, High Flow Therapy Delivery System, Microbulk Medical Gas Delivery, MedipureTM - LC Single and Dual Cylinder Carts, and Emergency Oxygen Supply Manifolds.

9.     Publicly, Praxair claims to maintain a safety record and compliance program that is superior to that of its peers in the industry, proclaiming, "Praxair is consistently a top safety performer — five times better than the U.S. industrial average and three times better than the U.S. chemical industry average. And we maintain this level of safety by actively seeking out risk factors and continuously improving performance worldwide in every key safety metric."

10.    As further explained, underscoring the safety implications of the improper use of its products, Praxair explains:

> At Praxair, we take care of your needs so you can take care of your patients. Tens of thousands of hospitals, clinics, nursing homes and other healthcare facilities trust us to provide medical gases like nitrogen to preserve vital blood and tissue, helium for MRIs, and oxygen and respiratory therapy gases to help patients breathe.

> In an industry that touches all of our lives, we know our customers expect the highest quality medical gases and equipment, and the most comprehensive service — and that's what we deliver. We are a single reliable source for medical and specialty gases, equipment and services. Our distribution network is the largest in the United States.

11.    Within the Company, however, compliance personnel and auditors are regularly chastised or ignored for attempting to implement measures that comport with federal and internal safety guidelines.  Praxair's justification for the rejection of these necessary safety and often lifesaving measures is cost – safety is routinely compromised in the interest of profits.

4

12.     Throughout the relevant time period, Praxair has sold these gases to various levels of Government while recklessly flouting Government regulations and internal guidelines requiring their safe production and use.  As a result of these violations, several disasters or near disasters have occurred across the country, including at Praxair and non-Praxair facilities.

13.     Relator is a former Praxair Engineer who was a certified Praxair auditor with an extensive career in the industry.  Among his many responsibilities during his 18 years of service with Praxair was oxygen cleaning auditor for which he traveled the country inspecting the facilities of Praxair and its downstream vendors for cleanliness.  Relator has personal knowledge of Praxair's pervasive quality assurance failures, and the dangerous conditions those failures created for its employees, and for the millions of consumers of its industrial and medical gases.

14.     As a certified oxygen-cleaning auditor, Relator discovered numerous safety and cleanliness violations of internal, industry, and federal regulations.  Among the violations observed and reported by Relator are:

- Contaminated valves used for Praxair's Grab 'n Go cylinders and other medical devices;

- Non-compatible materials used at Praxair and non-Praxair facilities;

- Use of unapproved vendors for Praxair oxygen producing products;

- Using unapproved vendors and approving unqualified vendors without an audit; and,

- Construction of plants with unqualified contractors.

15.     In each of these cases, Relator reported the violations to his superiors within the Company, and in the majority of the cases, little to nothing was done about it.  Relator personally observed on several occasions Praxair management declining to take certain necessary safety precautions because those precautions were too expensive.

16.     Indeed, Praxair's entire compliance department was severely understaffed and could not keep up with the demands required of the safety regulations.  As a result, Praxair continues to operate its facilities and supply its customers with devices and medical gases that are contaminated and/or defective.

17.     For several years, Relator struggled to convince Praxair management that its systems were vulnerable and that its compliance procedures were deficient.  Rather than address the concerns repeatedly urged by Relator, Praxair ignored them and chastised Relator for failing to embrace the business decisions shaped by a cost-saving, profit driven philosophy.  Despite years of strong performance and dedicated service, Relator was regularly passed up for promotion, and when he reported serious ethical and safety violations by senior Praxair officials to the Praxair Business Integrity group, he was terminated.

18.     In 2015, Praxair earned approximately $11 billion in revenues.  Generating a significant portion of this revenue are service contracts Praxair maintains with numerous government, military, and healthcare entities, including the Army, Navy, NASA, federal prisons, VA and other public hospitals, among others.

19.     The contamination of the Praxair devices, which delivered oxygen and other gases to Government agencies and public and private healthcare institutions rendered the devices inoperable.  No reasonable healthcare worker in the country would have supplied oxygen to a patient if it knew that the oxygen did, or even could have, come from a contaminated, defective cylinder.  Similarly, no division of the military would have sent a member of the armed services out to conduct a mission or a training exercise with oxygen it knew could be contaminated.

20.     Despite being armed with the knowledge that its internal controls and quality assurance were woefully deficient, and that many of its gases were contaminated because its

devices and their component parts were not properly or adequately being cleaned, Praxair continued to falsely certify compliance with the cleaning regulations to its customers.   In addition, Praxair regularly falsified certifications that vendors were properly vetted and approved.  These false certifications violated the FCA and the false claims act of the States.

21.    Based on the foregoing, Praxair has caused significant damage to the Government, and put many people in serious risk of harm.

## PARTIES

### A.    Defendants

22.    Defendant Praxair is the largest producer of industrial gases in the United States, headquartered in Danbury, CT with substantial operations in all 50 states.

23.    Defendant PDI is a Praxair subsidiary, which is also headquartered in Danbury, CT.

24.    Relator is unaware of the true names of certain defendants sued herein under the fictitious names Does 1-100, and will seek leave to amend this complaint to sue such parties by their actual names at such time as plaintiff becomes aware of them.

### B.    Relator

25.    Relator Jay Meyer is a citizen of the United States of America and is a resident of the State of New York.  He is a Professional engineer and compliance professional who worked for Praxair for approximately 19 years.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over the subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

27.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §
3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial
district in which the defendant or in the case of multiple defendants, any one defendant can be
found, resides, transacts business or in which any act proscribed by section 3729 occurred."
Section 3732(a) also authorizes nationwide service of process.  During the time period relevant
to this Complaint, Defendants resided and transacted business in the Southern District of New
York and most of the violations of 31 U.S.C. § 3729 described herein were the direct result of
actions which occurred within and at the direction of Defendants' employees and representatives
within this judicial district.

28.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of
the Defendants can be found in, reside in, and transact business in the Southern District of New
York and many of the violations of 31 U.S.C. § 3729 described herein occurred within this
judicial district.

29.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in
camera* and will remain under seal for a period of at least 60 days and shall not be served on the
Defendants until the Court so orders.

30.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government
with a copy of the Complaint and/or a written disclosure of substantially all material evidence
and material information in their possession contemporaneous with the filing of the Complaint.
Relator has complied with this provision by serving copies of this Complaint upon the Honorable
Preet Bharara, United States Attorney for the Southern District of New York and upon the
Honorable Loretta E. Lynch, Attorney General of the United States.

## GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT

### A.    The False Claims Act

31.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

32.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G) (emphasis added).  Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

33.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

34.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government

program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

35.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendants.  The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

36.     In this action, Praxair knowingly and routinely requested Government payment on service contracts, and falsely certified compliance with federal, industry, and internal guidelines regarding its quality controls for oxygen and industrial gas cleaning.  As a result of this illegal conduct, Praxair caused hundreds of millions of dollars to be improperly paid by numerous military, prison, and government healthcare institutions across the country.

**B.    Medicare**

37.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician, and Medicare Part D, which covers prescription drugs.

38.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

39.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services.  CMS establishes rules for the day-to-day administration of Medicare.  CMS contracts with private companies to handle day-to-day administration of Medicare.

40.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services.  These schedules specify the amounts payable for defined types of medical services and procedures.

**C.     Medicaid**

41.     Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients.  Medicaid was created in 1965 in Title XIX of the Social Security Act.

42.     Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

43.     At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

**D.     TRICARE**

44.     TRICARE is a federal program, which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the federal government.

45.     At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

46.     Medicare, Medicaid, and TRICARE, and other similar federal programs are referred to collectively herein as "federal health insurance programs."

**E.     Federal Cleaning Standards**

47.     Under Compressed Medical Gases Guideline (Feb. 1989), "Compressed medical gas (CMG)--Any liquefied or vaporized gas alone or in combination with other gases which is a drug as defined by Section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 321(g)(1))."

48.     Further, according to FDA Good Manufact. Practice for Medical Gases (2003 Draft), "Medical gases (e.g., oxygen, carbon dioxide, helium, nitrogen, nitrous oxide, medical air, and combinations of these) are drugs within the meaning of section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 321(g)(1)) and pursuant to section 503(b)(1)(A) of the Act (21 U.S.C. 353(b)(1)(A) are required to be dispensed by prescription."

49.     Under 21 C.F.R. § 211.84 "Testing and approval or rejection of components, drug product containers, and closures":

"(a) Each lot of components, drug product containers, and closures shall be withheld from use until the lot has been sampled, tested, or examined, as appropriate, and released for use by the quality control unit.

(b) Representative samples of each shipment of each lot shall be collected for testing or examination. The number of containers to be sampled, and the amount of material to be taken from each container, shall be based upon appropriate criteria such as statistical criteria for component variability, confidence levels, and degree of precision desired, the past quality history of the supplier, and the quantity needed for analysis and reserve where required by § 211.170.

(c) Samples shall be collected in accordance with the following procedures:

(1) The containers of components selected shall be cleaned when necessary in a manner to prevent introduction of contaminants into the component.

(2) The containers shall be opened, sampled, and resealed in a manner designed to prevent contamination of their contents and contamination of other components, drug product containers, or closures.

(3) Sterile equipment and aseptic sampling techniques shall be used when necessary.

(4) If it is necessary to sample a component from the top, middle, and bottom of its container, such sample subdivisions shall not be composited for testing.

(5) Sample containers shall be identified so that the following information can be determined: name of the material sampled, the lot number, the container from which the sample was taken, the date on which the sample was taken, and the name of the person who collected the sample.

(6) Containers from which samples have been taken shall be marked to show that samples have been removed from them.

(d) Samples shall be examined and tested as follows:

(1) At least one test shall be conducted to verify the identity of each component of a drug product. Specific identity tests, if they exist, shall be used.

(2) Each component shall be tested for conformity with all appropriate written specifications for purity, strength, and quality. In lieu of such testing by the manufacturer, a report of analysis may be accepted from the supplier of a component, provided that at least one specific identity test is conducted on such component by the manufacturer, and provided that the manufacturer establishes the reliability of the supplier's analyses through appropriate validation of the supplier's test results at appropriate intervals.

(3) Containers and closures shall be tested for conformity with all appropriate written specifications. In lieu of such testing by the manufacturer, a certificate of testing may be accepted from the supplier, provided that at least a visual identification is conducted on such containers/closures by the manufacturer and provided that the manufacturer establishes the reliability of the supplier's test results through appropriate validation of the supplier's test results at appropriate intervals.

(4) When appropriate, components shall be microscopically examined.

(5) Each lot of a component, drug product container, or closure that is liable to contamination with filth, insect infestation, or other extraneous adulterant shall be examined against established specifications for such contamination.

(6) Each lot of a component, drug product container, or closure with potential for microbiological contamination that is objectionable in view of its intended use shall be subjected to microbiological tests before use.

(e) Any lot of components, drug product containers, or closures that meets the appropriate written specifications of identity, strength, quality, and purity and related tests under paragraph (d) of this section may be approved and released for use. Any lot of such material that does not meet such specifications shall be rejected."

50.     Further, under 21 C.F.R. § 211.94 "Drug product containers and closures":

(a) Drug product containers and closures shall not be reactive, additive, or absorptive so as to alter the safety, identity, strength, quality, or purity of the drug beyond the official or established requirements.

(b) Container closure systems shall provide adequate protection against foreseeable external factors in storage and use that can cause deterioration or contamination of the drug product.

(c) Drug product containers and closures shall be clean and, where indicated by the nature of the drug, sterilized and processed to remove pyrogenic properties to assure that they are suitable for their intended use. Such depyrogenation processes shall be validated.

(d) Standards or specifications, methods of testing, and, where indicated, methods of cleaning, sterilizing, and processing to remove pyrogenic properties shall be written and followed for drug product containers and closures.

## F.  **Praxair Cleaning and Compliance Standards**

51.     Praxair Standard GS-38 is the main internal oxygen cleaning standard which outlines the general requirements for cleaning, inspecting, and packaging components used by Praxair to produce, store, or distribute liquid and gaseous oxygen.  The requirements apply to all Praxair vendors, which provide the components for Praxair oxygen producing systems.

52.     GS-38 states, "Cleaning shall ensure the removal of contaminants which could potentially cause mechanical malfunctions, system failures, fires, or explosions.  This service shall be performed by properly trained and qualified individuals at approved facilities or plant sites. Such facilities require proper approval certification by Buyer."  Praxair Standard GS-38, Section 4.2.

53.     GS-38 further explains certain contaminants must be removed using "properly validated and approved cleaning procedures" in order to prevent "system fires, explosions, or dangerous mechanical malfunctions," including:

- Hydrocarbon oils or greases

- Particulate matter, including loose or loosely adherent rust or mill scale, shop dirt, sandblast media, filings, chips, loose weld spatter, or other welding material (slag, wire, tacks, push-throughs, etc.)

- Films which are organic, potentially migratory or a source of particulates including conventional paints, varnishes, fluxes, or organic rust protectorants

- Water

- Unapproved pipe-thread lubricants, gasket sealants, or anti-seize compounds

54.     All cleaning personnel are to be "thoroughly trained in the proper cleaning methods and made aware of the serious consequences that could result from inadequate cleaning."

55.     The minimum level of cleanliness required for Praxair Standard GS-38 Cleanliness certification is 10 mg/ft$^2$ for fluids/greases and 10 mg/ft$^2$ for solids and particulates.

**G.     Industry Cleaning and Compliance Standards**

56.     Under CGA G-4.1, Section 2.1, "Oxygen equipment and systems, including all components and parts thereof, must be adequately cleaned to remove harmful contamination prior to the introduction of oxygen. Harmful contamination would include both organic and inorganic materials such as oils, greases, paper, fiber, rags, wood pieces, coal dust, solvents, weld slag, rust, sand, and dirt, which if not removed, could cause a combustion reaction in an oxygen atmosphere or result in an unacceptable product purity."

57.     Further, "[c]leaning a component or system for oxygen service involves the removal of combustible contaminants including the surface residue from manufacturing, hot

15

work, and assembly operations, as well as the removal of all cleaning agents and the prevention of recontamination before final assembly, installation, and use." CGA G-4.1 Section 2.2.

58.     And, "The removal of injurious contaminants can be accomplished by cleaning all parts and maintaining this condition during construction, by completely cleaning the system after construction, or by a combination of the two.  CGA G-4.1 Section 2.3

59.     CGA-4.1 provides several cleaning procedures, which would be appropriate for oxygen cleaning, but requires direct supervision in all cases by an "individual skilled in the techniques required for oxygen service cleaning."  CGA-4.1, Section 3.1

## SPECIFIC ALLEGATIONS

### I.   Praxair's Production and Distribution of Oxygen and Other Industrial Gases

60.     In order to supply industrial and medical gases to its customers in all fifty states, Praxair maintains hundreds of facilities across the country.  These facilities produce both liquid and gaseous oxygen, as well as nitrogen, hydrogen and other gases, for industrial and medical use.

61.     The oxygen can be produced at a Praxair facility, filled and transported in cylinders to its customers, or, produced on site at many facilities such as large public and private hospitals as well as military bases, which are constructed, monitored, and maintained and by Praxair.

62.     Praxair produces oxygen using an air separation unit, which liquefies atmospheric air and separates the oxygen by continuous cryogenic distillation.   The oxygen is then removed, cooled, and stored as a cryogenic liquid. A typical customer system consists of a cryogenic storage tank, one or more vaporizers and a pressure control system.  Vaporizers convert the liquid oxygen into a gaseous state.  A pressure control manifold then controls the gas pressure

16

that is fed to the process or application. There are dozens of components and parts used in this process, several of which come from different Praxair vendors.

63. Praxair also uses a non-cryogenic selective absorption process to produce gaseous oxygen, which can be filled and delivered to customers.

64. In the distribution phase, oxygen is either packaged and delivered to customers in portable cylinders (i.e. Grab n' Go) or, in many cases, produced and converted to gaseous form on-site from cryogenic storage. At many public hospitals, Praxair vaporizers convert liquid to gas on-site for delivery to patients. In both cases, Praxair is directly involved in the delivery, distribution, and on site storage process, and is directly responsible for the safe maintenance of the equipment used to facilitate the process. Praxair contracts typically require Praxair to continually monitor and maintain the facilities it installs to perform on-site gaseous conversion.

65. The systems and devices, which operate the production, storage, and distribution of oxygen by Praxair for its public and private customers are made up of dozens of component parts including cylinders, valves, regulators, regulator modules, and flow meters, among others.

66. The improper maintenance, use, and cleaning of these components has directly caused major fires and explosions at Praxair and non-Praxair facilities.

67. Praxair purchases these components from vendors through contracts with companies like Weldon, Tescom, Sponsler, Airborne Labs, and Pall Trinity, among others.

## II. **Praxair's Duty to Monitor and Ensure Compliance of Vendors**

68. Praxair's use of an extensive network of downstream vendors complicates the important cleaning standards imposed by the federal government with respect to the production and distribution of medical and industrial gases.

69.     The use of these vendors requires Praxair to not only monitor its own facilities and devices, but to ensure that these vendors are properly cleaning the components in accordance with GS-38, CGA-, and federal, FDA regulations.

70.     To do so, Praxair maintains a team of compliance auditors who are supposed to regularly perform GS-38 audits on the dozens of vendors across the country.

71.     Once a vendor has been audited, and cleared by a certified cleaning auditor, as the process is supposed to work, these vendors are "technically approved."  According to GS-38, Praxair must always use "technically approved" vendors for its Oxygen producing devices – more often than not, Praxair failed to do so.

72.     This rigid approval process stems from Praxair's certification of compliance with GS-38, CGA-4.1, and federal FDA regulations on each sale of a Praxair Oxygen device.  That certification reads as follows:

> The material, assemblies, and systems supplied herein fully comply with Praxair Distribution's Safety, Quality, Assembly, and Testing standard operating procedures and are manufactured per the criteria of ASME B31.3.  Praxair Distribution, Inc. certifies that the wetted components of the assembly or system contained herein have been cleaned for Oxygen Service in accordance with the recommended methods of the Compressed Gas Association, Inc. as published in CGA G-41 and ASTM G93, in addition, to Praxair Inc. Oxygen Cleaning Standard GS-038, Class 2, O2 Cleaning Specification.  These components, assemblies, and/or systems are clean for use in Oxygen service to the lesser of their rated pressures.  Extra care must be taken during field installations to prevent particle generations and/or combustible film contamination.

73.     Thus, in order for Praxair to continue to represent that its products adhered to these strict guidelines, it needed to regularly ensure that its employees as well as those of its vendors understood and adhered to them.

74.     Praxair guidelines also required, and Praxair should have demanded, that these vendors to certify compliance with these safety and cleaning standards.  However, Praxair's failure to follow up on these certifications and perform adequate audits on these downstream

18

vendors, as described in more detail below, rendered these self-serving certifications meaningless as to Praxair's customers.

75.     With regard to FDA compliance, Praxair also required vendors to confirm compliance with FDA regulations, and even to confirm technical approval by a Praxair auditor. As Relator learned, Praxair management regularly blindly accepted vendor certification of compliance without scrutiny, resulting in the use of numerous non-GS-38, FDA compliant vendors.

76.     As described herein, Praxair rarely implemented the safety measures urged by auditors, it used auditors who were not qualified to conduct the audits, and it virtually stopped conducting audits all together in favor of this "honor's system" of vetting its suppliers.  As a result, patients, military personnel, and employees of Praxair's customers were put at great risk because the component parts used for Praxair's systems and devices were contaminated and/or defective.

77.     Indeed, despite the enormous safety implications of the work it did and the products it sold, safety improvements were often the first thing to go when cost-cutting measures were being implemented.  Almost universally, when Relator made safety recommendations based upon his well-reasoned judgment and extensive experience in the field, the first question from management was "how much will it cost?".

78.     Praxair's profit-driven culture permeated every division of the Company, including, in particular, its auditing and compliance department.

79.     On numerous occasions Relator recommended that Praxair make certain adjustments to its protocols, add compliance staff to keep up with demand, purchase new parts

that were more compatible with its devices, and conduct recalls for defective products.  More often than not, these recommendations were rejected due to cost.

### III.  Relator Discovers Pervasive Quality Control Deficiencies That Resulted in the Delivery of Contaminated Oxygen to its Customers

#### A.  Praxair Hired Relator as an Engineer

80.     In 1997, Praxair hired Relator as a Manufacturing Design Engineer.  In this role, Relator's primary responsibilities included design, manufacture, and inspection of heat exchangers and new line oxygen compressors.  In 2001, Relator was trained and qualified as an "oxygen cleaning auditor."

81.     In 2007, Relator became a Project Manager for Praxair Operations Division, for which he performed site inspections, prepared estimates for certain projects, and supervised the design and execution of certain Praxair site constructions.  He became Praxair's lead oxygen cleaning auditor at the time, which included both conducting and supervising vendor audits as well as training new oxygen cleaning auditors.  Relator also created company-wide design and safety standards and conducted company-wide safety training seminars.   In 2011, Relator was promoted to Engineering Consultant for Praxair's Operations Group.[1]

82.     As an oxygen-cleaning auditor from 2001-2015, Relator gained personal knowledge of Praxair's failure to provide adequate quality controls in compliance with the regulations and its own certifications, and its failure to cure significant violations of these regulations rendered its products defective.

---

[1] The director who promoted Relator ultimately resigned from Praxair due in large part to his inability to implement constructive change to Praxair's culture of ignorance regarding safety.

B. **Relator Discovers Systemic Compliance Failures**

83.     In 2014, Relator attended a Safety Meeting for Managers in the Tonawanda, NY

Praxair office at the request of his manager who could not be there.  At that meeting, a Corporate

Safety Manager explained that OSHA required Praxair to collect safety data to be used in its

corporate safety statistics.  During the course of this discussion, the Safety Manager stated, "it is

my job to make sure these incidents are classified in a way which doesn't affect our OSHA

stats."  Relator understood this to mean that this Safety Manager was "cooking the books" - a

mantra embedded in the corporate culture at Praxair.

84.     During his time as a cleaning auditor for Praxair, Relator observed numerous

compliance failures that rendered its certifications of compliance false, and its products, which it

sold to the Government defective.

85.     Relator routinely implored management to institute proper auditing procedures in

order to ensure the safe use of Praxair products.  For example, in May 2010, Relator emailed

Praxair Global Safety Director and its Executive Director of USIG recommending that Praxair

perform audits and create procedures for purchase and technical qualification of regulators.  His

recommendations, made in response to a perceived dearth of quality controls in this area, were

wholly ignored.

86.     In one major incident, the failure to follow up on a safety gap had devastating

consequences for a plant in East Chicago, IL.  In July 2011, the air separation plant had a

cryogenic explosion caused in large part by a lack of standards, lack of operating procedures, and

a failure to perform a process safety review.  During a Process Safety Management ("PSM")

audit of the site, Relator discovered a failed fire water pump test report, which showed three

emergency fire water pumps had failed to function properly.  The report had been buried in the

file, and remained undiscovered for four years due to a complete lack of oversight.  A Praxair

Small Projects Team recommended that the plant build $1 million water tower, but management refused due to the expense.  The plant had two subsequent major fire and explosion incidents due to its failure to comply with safety regulations.

87.    Relator's concerns about Praxair's lackluster safety protocols continued to grow. In 2011, he learned that Praxair routinely did not properly screen its vendors for GS-38 and federal compliance.  This concern materialized when he learned that PDI had been buying components from numerous vendors that had not been GS-38 approved.  Indeed, many of these vendors had never been audited, yet Praxair regularly purchased parts from them for their oxygen producing and distributing devices and plants.  Additionally, in September 2012, Relator read a PDI Bulletin that listed six PDI approved "high pressure filling lead" suppliers, and identified them as part of the "PDI Safety Critical Commodity Program."  Each of these suppliers, however, had been approved by an "auditor in training."  That same "auditor in training" had approved numerous vendors for Praxair, and, upon request, could never produce any audits showing that those vendors were adequately vetted.

88.    Indeed, this type of conduct was common at Praxair.   In January 2014, Relator learned that PDI Quality Control had been qualifying vendors for PDI by simply asking if they were qualified, without any audit or technical approval process by a qualified Praxair auditor. As a PDI Quality Control team member explained to Relator, "They (Praxair management) want me to lie.  I feel terrible because I know they are not technically qualified.  I feel what I am doing is unsafe."

89.    In one case, in May 2015, Relator learned of contaminated oxygen regulators, which were sent to the Praxair Metering lab for examination that had been cleaned by an Ohio

company, Cleveland Instruments.  Relator discovered that Cleveland Instruments failed to follow proper cleaning procedures, and incidentally also failed to reassemble the regulators properly.

90.     Relator investigated further and learned that Cleveland Instruments had not been approved by a qualified Praxair auditor but had been cleaning parts for Praxair for several years. Inquiring internally, Realtor learned that Cleveland Instruments had a signed approval letter from an unqualified Praxair employee who admitted that she was improperly directed to sign the approval letter without a proper audit by her supervisor.

91.     As a result of this conduct, dozens of PDI vendors were used for several years that were not qualified under GS-38 guidelines.   This included Airborne Labs which was a testing site used by Praxair that did not have a valid cleaning process, Cleveland Instruments which was not approved for cleaning, PDI San Antonio which improperly claimed that it had been certified, Weldcoa which was using at least eighteen vendors for components of its automated cylinders sold to Praxair that were not GS-38 approved, and Sponsler, which was not approved but was selling Praxair flow meters for years, among many others.

92.     In addition to these vendors who were not approved or who used unapproved vendors of their own, Relator learned through an October 2012 audit he had conducted of Western Enterprises that it had been using several unapproved vendors for the manufacturing of the Grab n' Go oxygen totes, a portable oxygen tank used in hospitals and clinics all over the country.  The Grab n' Go had been the subject of several recalls due to fires and two deaths. During an FDA audit shortly after his own, Praxair officers requested Relator's report, which had not been completed and contained negative findings.  The officers ultimately disclosed the incomplete report to the FDA auditor, without the negative findings.

23

93.     Relator believes that the extensive use of unapproved vendors by Praxair contributed to several disasters at Praxair and non-Praxair facilities, including in October 2013, when a flash fire occurred at a PDI cylinder filling location (filling equipment was manufactured by Weldcoa) in Phoenix, AZ.  Praxair compliance personnel completed an audit of the event in just one week, and the fill station was up and running in just two weeks.  Relator was deeply concerned about the adequacy of the review.  A few months later, Relator learned that the fill station used eighteen to twenty unapproved component vendors to assemble the station.  Relator believes that one or more of the components from these vendors had hydrocarbon residues, which migrated to a low velocity point in the system and ignited with the help of some ignition source – similar to the problems cautioned in Praxair Standard GS-38, Section 4.1 cited above. Relator has personal knowledge that Praxair never addressed this issue and continues to operate the fill station.

94.     As discussed, Praxair's response to these disasters always focused on profits, and usually ignored or buried the problem.  In 2013, Relator emailed several Praxair VPs about two incidents at a competitor's air separation plants involving oxygen fires that caused four fatalities. Relator forwarded an alert from European Industrial Gases Association ("EIGA") reminding gas companies to reinforce cleanliness requirements with valve manufacturers, use only oxygen compatible materials, and to review the material selections offered by the valve manufacturers. Relator reminded them, in the email, of the lack of training and the lack of knowledge he had witnessed over the years doing his oxygen training and audits of Praxair's vendors and contractors.  Relator later learned that he was almost fired for sending the email because it put management on notice that Praxair had not been complying with federal and GS-38 regulations.

95.     Two years later, Relator was admonished for auditing Praxair Customer Service locations.  He had intended to audit six of them, and was told after one, to stop immediately.  His supervisor chastised him, and he was directed to cease auditing the other locations.  Ultimately, Relator's repeated reporting of Praxair safety violations led to his dismissal from the Company.

96.     As described in more detail below, the failure to use approved vendors and to adequately audit and monitor existing approved vendors actually resulted in the purchase and use of contaminated components in Praxair's oxygen devices.

97.     As a result of this conduct, virtually every certification to customers during this time period was false.

### C. Praxair's Woefully Deficient Quality Assurance Resulted in the Sale of Defective Products and the Delivery of Contaminated Oxygen

98.     As discussed herein, Praxair, particularly PDI, severely understaffed its quality assurance and controls departments with unqualified auditors.

99.     Praxair Customer Service and Praxair Home Care groups often delegated control responsibilities to "third party verifiers" who were not "vetted" or technically approved by Praxair qualified auditors.  This arose most often in the installation of cryogenic oxygen systems at hospitals, and included companies like MedPipe, MedGas, Med-Con, FS Medical, and Evergreen Medical – none of which had been audited or technically approved by a Praxair GS-38 qualified auditor.  These "verifiers" were the final inspectors in charge of certifying those hospital oxygen installations as "safe" and in compliance with Praxair's GS-38 as well as other industry standards, including NFPA99, CGA M-1, and ASSE Medical Gas Certification Standards.

100.    As a direct result of its porous or non-existent auditing protocols and quality controls, Praxair's devices put the people that operated the equipment as well as the people that consumed its medical gases in jeopardy.

101.    These quality control failures rendered the devices and the gases consumed by patients or the military defective as the highly dangerous nature of the consumption and use of these products demanded the highest safety standards.  Without those standards being followed, the products were worthless.

102.    A direct consequence of this conduct was the supply of Praxair products that contained non-compatible parts or contaminated components.

103.    Some examples of products with non-compatible parts supplied by Praxair, as learned by Relator through numerous audits were:

- **United Technologies**: In March 2009, high-pressure gaseous oxygen receivers containing Aviator's Breathing Oxygen ("ABO") used non-compatible piping system components, which caused a flash fire and serious injuries to two technicians.  Praxair's Customer Services Group installed the system.  Following an audit of the site, Relator found similar problems at two other locations, in New Jersey and North Carolina. (Following these incidents, a "Standards Harmonization" group was formed to synthesize safety standards for Praxair's Customer Services Group.  That group was disbanded the following year as a cost-cutting measure, despite identifying 190 safety gaps and recommendations.).

- **Grove, TX Air Separation Plant**: In 2013, Relator inspected an air separation plant in Grove, TX and found that it had been using an incompatible carbon steel, high-pressure oxygen vent valve.  After reporting it to his supervisors, Relator learned that they refused to swap out the valve for an appropriate, approved valve due to cost.  Upon sharing this with two Praxair Corporate Fellows, one remarked, "It looks like I should start selling my Praxair stock."

- **Pall Trinity Filters**: In 2010, Relator learned that Praxair was using a non-compatible filter from vendor Pall Trinity, which was also not approved under GS-38, for several of its air separation plants that were selling ABO grade oxygen to the military and to NASA.  The Relator was able to redesign the unsafe oxygen filter with a different manufacturer and separately train and qualify an aftermarket oxygen cleaning and testing company.  However, Praxair continued to use Pall Trinity, despite not being a technically approved vendor.  A technical

26

qualification would include particle testing and validation (i.e. bubble point testing). This was not validated at Pall Trinity, nor the regionally located cleaning companies Praxair subcontracted to.

- **Laport, IN Plant**: In 2013, Relator learned that a Praxair plant had leaking valves in their oxygen and nitrogen fill zone areas. To fix the problem, the plant manager had a non-qualified contractor replace the valves with non-compatible valves. For at least four weeks, the plant continued to operate without the appropriate valves, despite Relator's recommendation that it be shut down until the appropriate valves were installed.

- **Boeing Explosion**: In June 2015, an explosion at a Boeing plant due to cryogenic nitrogen leaking past the low temperature control module. Praxair installed the system, and Relator is informed and believes that the reason for the leak was that Praxair Customer Service installed the wrong parts.

- **Deer Park, TX - Failing Expansion Joints**: In July 2014, Relator discovered that Praxair's air separation plants were vulnerable due to numerous failing expansion joints (thin stainless steel piping which allows axial and radial movement in piping) due to improper installation. Praxair at the time had no procedures in place to deal with this issue, but was replacing approximately thirty each year without any follow up on the problem. Relator wrote a Standard Maintenance Procedure ("SMP") report regarding my findings as well as recommendations on proper installation. Praxair never followed up on my report, but instead, took other, much cheaper measures to "address" the problem.

- **Hemlock, MI – Brazing Procedures**: In 2014, Relator participated in a Root Cause Analysis ("RCA") following the rupture of a fill pipe during the filling of a liquid nitrogen tank, which resulted in 5600 gallons of liquid nitrogen to be spilled onto the ground. Relator and a compliance team determined that the cause was a non-approved brazing procedure in the installation of a fill connection pipe for the tank. The contractor used was not a technically approved contractor and a brazing joint failed. This followed Relator's raising of concerns since 2008 that a Praxair NAIG-7 procedure allowed plants to use local contractors for "maintenance activities" without being technically approved. These concerns were shrugged off and never addressed.

104. Relator also personally learned that Praxair repeatedly used components that were either contaminated or stored and transported in contaminated conditions. Some examples include:

- **Tescom Prostar Regulators**: In 2010, Relator traveled to a Praxair air separation plant in Neosho, MO for an audit where he discovered regulators (Tescom) and flow meters (Sponsler) that were to be used for a new oxygen system installation.

In both cases, the components were not properly bagged or tagged per GS-38. In the case of the Tescom regulators, Relator learned that the regulators were "technically approved" by a Praxair Purchasing Agent – a blatant violation of GS-38. Praxair had been buying these regulators from Tescom since 2005, certifying compliance with GS-38 and federal regulations, despite having never audited them in that time period. The Relator, through further investigation, found that the Tescom regulators were shipped to a PDI location in San Antonio Texas for modification. The PDI location attached an Oxygen Cleaning Certificate to the regulator. Neither the person signing the certificate or the PDI location was qualified to do so. In addition, the materials of construction of the oxygen regulator were not in compliance with Praxair Standards. The inferior materials greatly increased the risk of a fire or explosion. This material change was later made, but no product recall was undertaken.

- **Sherwood Valve**: In 2012, Relator conducted audits for the Packaged Gases division and began with Sherwood Valve. During the audit, Relator learned that Praxair had been purchasing the standard valve from Sherwood for years and that the vendor was not cleaning the product at all. Praxair declined to use Sherwood's "clean room" or Sherwood's bagging and tagging services in order to cut costs. When proper tests were run on the valves, Relator learned that the valves were contaminated well above acceptable levels under GS-38. When Relator reported the contamination to his supervisors, they assured him that a recall would be conducted. No recall was ever conducted.

- **Grab n' Go**: Due to an improperly assembled valve system, the Grab n' Go tote allowed grease and oil to leak into the cylinder. The contaminated cylinders were thus easily susceptible to fire as they contained oxygen and were made out of aluminum, which burned very easily. In one weeklong meeting at the Praxair Material Engineering Laboratory ("MEL") PDI's Directors of Quality Control and Quality Assurance were frantically looking to the MEL to come up with a cleaning procedure for the contaminated cylinders. With the reduction of acceptable solvents being available, they decided to try cleaning solution Vertrel. It worked, but not well. It took too much time and resources because access and inspection was difficult due to the small opening at the top of the cylinder. Ultimately, a chemist from the MEL discovered that the detergent Simple Green worked best. Ironically, Relator is unaware of one PDI filling location that was audited or technically qualified to clean after this, thus never validating GS-38 requirements.

105.    Many of the contamination issues personally observed by Relator were due to PDI's complete failure to audit or monitor its own vendors. As one senior Quality Manager once explained, "Out of all the Praxair businesses I have assisted over the past ten years, PDI is the most exposed."

28

**IV.**  **Praxair's Continued and Pervasive Quality Assurance and Internal Control Failures Directly Resulted in The Submission of Express and Implied Certifications in Violation of the False Claims Acts**

106.    Praxair typically enters into five-year service contracts with public hospitals, state universities, divisions of the military, and government agencies.

107.    For example, in 2015, Praxair signed a five-year contract with NASA for $53 million to provide liquid hydrogen for use as fuel for rocket and space shuttle launches, touting, "Praxair's hydrogen manufacturing infrastructure and delivery capability satisfies NASA's stringent standards for product quality and on-time delivery to fulfill the agency's missions."

108.    Praxair signed a similar contract with NASA for liquid oxygen and liquid nitrogen for $5.3 million and had a contract with the Defense Logistics Agency, the Department of Defense's largest logistics combat support agency for $1.7 million to supply compressed gases. Additionally, Praxair is the primary supplier of oxygen to public hospitals across the country, providing both on site distribution and maintenance as well as delivering oxygen tanks for use with patients.

109.    The sale of Praxair services and devices contained numerous representations regarding its compliance with safety regulations.  These representations were made in services contracts with its Government customers that included certifications confirming its compliance with these regulations.   With respect to its oxygen producing devices, Praxair pledged the following:

> The material, assemblies, and systems supplied herein fully comply with Praxair Distribution's Safety, Quality, Assembly, and Testing standard operating procedures and are manufactured per the criteria of ASME B31.3.  Praxair Distribution, Inc. certifies that the wetted components of the assembly or system contained herein have been cleaned for Oxygen Service in accordance with the recommended methods of the Compressed Gas Association, Inc. as published in CGA G-41 and ASTM G93, in addition, to Praxair Inc. Oxygen Cleaning Standard GS-038, Class 2, O2 Cleaning Specification.   These components, assemblies, and/or systems are clean for use in Oxygen service to the lesser

29

of their rated pressures.  Extra care must be taken during field installations to prevent particle generations and/or combustible film contamination.

110.    Praxair's failure to properly audit or monitor its vendors, while representing the compliance of its products, using their components, rendered these certifications false and its products defective.  Further, Praxair's failure to recall or correct the deficiencies caused by these unapproved vendors, as well as itself in the operation and maintenance of its own facilities, rendered these certifications false and its products defective.

111.    The Government would not have purchased Praxair's products, already highly dangerous if used improperly, if it had known of the systemic quality assurance and quality control failure at Praxair.

112.    Praxair's false certifications of compliance and its sale of defective products to the Government has caused significant monetary damages to the Government amounting to hundreds of millions of dollars and has put an enormous amount of people in danger.

## V.    Praxair Terminated Relator for Reporting the Systemic Compliance Failures within the Company

113.    As described herein, Relator maintained the highest standards in the performance of his job as a compliance auditor for Praxair.  In his role as oxygen cleaning auditor, he regularly reported compliance deficiencies to management as he had grave concerns about people using Praxair products knowing that they were either contaminated or improperly constructed.

114.    Relator has personal knowledge that for many years he was passed up for promotion and negatively treated because of his internal reporting of these compliance failures. Indeed, Relator was specifically told that his continued reporting of violations and his

unwillingness to be complicit with less expensive but more hazardous work conditions was holding him back within the Company.

115.    Relator suffered this negative treatment despite many years of loyal, dedicated service during which Relator was relied upon extensively to review and audit Praxair plants all over the world, and was loaned out for years to PDI because it did not have any qualified auditors of its own.

116.    On March 2, 2015, Relator filed a Praxair Business Integrity complaint citing the false submission of his report during an FDA audit, naming the officers involved in the incident.

117.    On August 15, 2015, Relator was terminated after almost19 years of service because he would not be complicit in the highly dangerous and unethical business decisions being made by Praxair management that threatened the safety of tens of thousands of people using their products.

## CLAIMS FOR RELIEF

### COUNT I
### (False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A))

118.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

119.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

120.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT II
**(False Claims Act: Making or Using A False Record or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2))**

121.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

122.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the defendants – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

123.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT III
**(False Claims Act: Retaining Overpayment 31 U.S.C. § 3729(a)(1)(G))**

124.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

125.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

Government, or knowing conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(1).

126.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT IV
### (RETALIATION (31 U.S.C. § 3730(h))

127.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

128.    By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of his employment after he lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors and corporate representatives in violation of 31 U.S.C. § 3730(h).

129.    Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

### COUNT V
### (California False Claims and Reporting Act)
### (Cal. Gov't Code § 12650, et seq.)

130.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

131.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the California State Government.

132. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

133. The California State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

134. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

135. Pursuant to the California False Claims and Reporting Act, the State of California is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT VI
### (Delaware False Claims and Reporting Act)
### (Del. Code Ann. Tit. 6 §§ 1201, et seq.)

136. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

137. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Delaware State Government.

138.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

139.    The Delaware State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

140.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

141.    Pursuant to the Delaware False Claims and Reporting Act, the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT VII
### (Florida False Claims Act)
### (Fla. Stat. Ann. §§ 68.081, et seq.)

142.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

143.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Florida State Government.

144.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

145.    The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

146.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

147.    Pursuant to the Florida False Claims Act, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT VIII**
**(Georgia Taxpayer Protection Act)**
**(Ga. Code Ann. §§ 23-3-120, et seq.)**

148.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

149.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Georgia State Government.

150.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

151.    The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

152.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

153.    Pursuant to the Georgia Taxpayer Protection Act, the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT IX
### (Hawaii False Claims Act)
### (Haw. Rev. Stat. § 1661-21, et seq.)

154.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

155.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Hawaii State Government.

156.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

157.    The Hawaii State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

158.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

159.    Pursuant to the Hawaii False Claims Act, the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT X
### (Illinois Whistleblower Reward and Protection Act)
### (740 Ill. Comp. Stat. §§ 175/1, et seq.)

160.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

161.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Illinois State Government.

162.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

163.    The Illinois State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

164.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

165.    Pursuant to the Illinois False Claims and Reporting Act, the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

### COUNT XI
### (Indiana False Claims Act)
### (Indiana Code §§ 5-11-5.5, et seq.)

166.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

167.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Indiana State Government.

168.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

169.    The Indiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

170.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

171.    Pursuant to the Indiana False Claims Act, the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XII**
**(Iowa False Claims Act)**
**(Iowa Code Ann. §§ 685.1, et seq.)**

172.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

173.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent

claims for payment or approval in connection with the sale of medical and/or industrial gases to the Iowa State Government.

174.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

175.   The Iowa State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

176.   By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

177.   Pursuant to the Iowa False Claims Act, the State of Iowa is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XIII
### (Massachusetts False Claims Law)
### (Mass. Gen. Laws ch. 12, §§ 5A, et seq.)

178.   Relator repeats and incorporates by reference the allegations above as if fully contained herein.

179.   By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Massachusetts State Government.

180.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

181.    The Massachusetts State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

182.    By reason of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

183.    Pursuant to the Massachusetts False Claims and Reporting Act, the State of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XIV
### (Minnesota False Claims Act)
### (Minn. Stat. §§ 15C.01, et seq.)

184.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

185.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Minnesota State Government.

186. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

187. The Minnesota State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

188. By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

189. Pursuant to the Minnesota False Claims Act, the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XV
### (Montana False Claims Law)
### (Mont. Code Ann. §§ 17-8-402, et seq.)

190. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

191. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Montana State Government.

192.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

193.     The Montana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

194.     By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

195.     Pursuant to the Montana False Claims Act, the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XVI
### (Nevada False Claims Act)
### (Nev. Rev. Stat. §§ 357.010, et seq.)

196.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

197.     By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Nevada State Government.

198.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

199.    The Nevada State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

200.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

201.    Pursuant to the Nevada False Claims Act, the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XVII
### (New Jersey False Claims Act)
### (N.J. Stat. Ann. §§ 2A:32C-1, et seq.)

202.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

203.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the New Jersey State Government.

204.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

205.     The New Jersey State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

206.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

207.     Pursuant to the New Jersey False Claims Act, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

### COUNT XVIII
### (New Mexico Fraud Against Taxpayers Act)
### (N.M. Stat. Ann., §§ 44-9-1, et seq.)

208.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

209.     By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the New Mexico State Government.

210.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

211.     The New Mexico State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

212.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

213.     Pursuant to the New Mexico Fraud Against Tax Payers Act, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XIX
### (New York False Claims Act)
### (N.Y. State Fin. Law §§ 187, et seq.)

214.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

215.     By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the New York State Government.

216. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

217. The New York State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

218. By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

219. Pursuant to the New York False Claims Act, the State of New York is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XX
### (North Carolina False Claims Act)
### (N.C. Gen. Stat. Ann. 52 §§ 1-605, et seq.)

220. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

221. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the North Carolina State Government.

222.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

223.    The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

224.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

225.    Pursuant to the North Carolina False Claims Act, the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XXI
### (Rhode Island False Claims Act)
### (R.I. Gen. Laws, §§ 9-1.1-1, et seq.)

226.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

227.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Rhode Island State Government.

49

228.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

229.    The Rhode Island State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

230.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

231.    Pursuant to the Rhode Island False Claims Act, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XXII**
**(Tennessee False Claims Act)**
**(Tenn. Code Ann. §§ 4-18-101, et seq.)**

232.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

233.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Tennessee State Government.

234.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

235.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

236.    By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

237.    Pursuant to the Tennessee False Claims Act, the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XXIII
### (Vermont False Claims Act)
### (32 V.S.A. §630, et seq.)

238.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

239.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Vermont State Government.

240.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

241.     The Vermont State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

242.     By reason of the Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

243.     Pursuant to the Vermont False Claims Act, the State of Vermont is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XXIV
### (Virginia Fraud Against Taxpayers Act)
### (Va. Code Ann. §§ 8.01-216.1, et seq.)

244.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

245.     By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the Virginia Commonwealth Government.

246.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

247.    The Virginia Commonwealth Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

248.    By reason of the Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

249.    Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XXV
### (District of Columbia False Claims Act)
### (D.C. Code Ann. §§ 2-308.03, et seq.)

250.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

251.    By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with the sale of medical and/or industrial gases to the District of Columbia.

252.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the District of Columbia to approve and pay such false and fraudulent claims.

253.    The District of Columbia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

254.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

255.    Pursuant to the District of Columbia False Claims Act, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff request the following relief from each of the Defendants, jointly and severally, as to the federal claims:

a.    Three times the amount of damages that the Government sustained because of the acts of Defendants;

b.    A civil penalty of $11,000 for each violation;

c.    An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

d.    Award of an amount for reasonable expenses necessarily incurred;

e.    Award of the Qui Tam Plaintiff reasonable attorneys' fees and costs;

f.    Interest;

g.      Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the

False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with

appropriate interest; (2) compensation for special damages sustained by Relator in an amount to

be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive

damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and

litigation costs in connection with Relator's Section (h) claim;

h.      Such further relief as the Court deems just.

**WHEREFORE**, for each of these claims, the Qui Tam Plaintiff requests the following relief

from each of the Defendants, jointly and severally, as to the State claims:

A.      Relator and each names State Plaintiff be awarded statutory damages in an

amount equal to three times the amount of actual damages sustained by each State as a result of

Defendants' actions, as well as the maximum statutory civil penalty for each violation by

Defendants within each State, all as provided by:

> Cal. Govt. Code § 12651;
> 6 Del. C. § 1201;
> Fla. Stat. Ann. § 68.082;
> Ga. Code Ann. § 23-3-121;
> Haw. Rev. Stat. § 661-21;
> 740 Ill. Comp. Stat. § 175/3;
> Ind. Code § 5-11-5.5-2;
> Iowa Code Ann. § 685.2;
> Mass. Gen. Laws Ch. 12 § 5B;
> Minn. Stat. § 15C.02;
> Mont. Code Ann. § 17-8-403(2);
> Nev. Rev. Stat. Ann. § 357.040;
> N.J. Stat. Ann. § 2A:32C-3;
> N.M. Stat. Ann. § 27-14-4 and § 44-9-3;
> N.Y. Fin. Law § 189.1(g);
> N.C. Gen. Stat. Ann. 52 § 1-607;
> R.I. Gen. Laws § 9-1.1-3;
> Tenn. Code Ann. § 4-18-103;
> 32 V.S.A. §630;
> Va. Code Ann. § 8.01-216.3;

D.C. Code Ann. § 2-308.14;

B.    Relator be awarded his relator's share of any judgment to the maximum amount

provided pursuant to:

Cal. Govt. Code § 12651(g)(2);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.085;
Ga. Code Ann. § 23-3-122(g);
Haw. Rev. Stat. § 661-27;
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
Iowa Code Ann. § 685.3;
Mass. Gen. Laws Ch. 12 § 5F;
Minn. Stat. § 15C.13;
Mont. Code Ann. § 17-8-410;
Nev. Rev. Stat. Ann. § 357.210;
N.J. Stat. Ann. § 2A:32C-7;
N.M. Stat. Ann. § 27-14-9 and § 44-9-7;
N.Y. Fin. Law § 190.6;
N.C. Gen. Stat. Ann. 52 § 1-610;
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
32 V.S.A. §635(b);
Va. Code Ann. § 8.01-216.7;
D.C. Code Ann. § 2-308.15;

C.    Relator be awarded all costs and expenses associated with each of the pendent

State claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.086;
Ga. Code Ann. § 23-3-121(c);
Haw. Rev. Stat. § 661-27;
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
Iowa Code Ann. § 685.2;
Mass. Gen. Laws Ch. 12 § 5F;
Minn. Stat. § 15C.12;
Mont. Code Ann. § 17-8-411;
Nev. Rev. Stat. Ann. § 357.180;
N.J. Stat. Ann. § 2A:32C-8;

N.M. Stat. Ann. § 27-14-9 and § 44-9-7;
N.Y. Fin. Law § 190.7;
N.C. Gen. Stat. Ann. 52 § 1-613;
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
32 V.S.A. §630 (c);
Va. Code Ann. § 8.01-216.7;
D.C. Code Ann. § 2-308.15;

D.      Relator and the State Plaintiffs be awarded such other and further relief as the

Court may deem to be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Relator hereby demands trial by jury.

Dated: May 27, 2016                          Respectfully submitted,

                                             By: _____
                                             David B. Harrison
                                             Spiro LLC
                                             830 Morris Turnpike, 2nd Floor
                                             Short Hills, NJ 07078
                                             Tel: (973) 232-0882
                                             Fax: (973) 232-0887

                                             Robert A. Magnanini
                                             Stone & Magnanini LLP
                                             100 Connell Drive, Ste. 2100
                                             Berkeley Heights, NJ 07922
                                             Tel: (973) 218-1111

                                             *Attorneys for Plaintiff-Relator*